# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

No. 14-70017

---

United States Court of Appeals
Fifth Circuit

**FILED**

November 9, 2015

Lyle W. Cayce
Clerk

KERRY DIMART ALLEN,

       Petitioner – Appellant,

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

       Respondent – Appellee.

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before KING, DAVIS, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

       Kerry Allen was convicted of capital murder and sentenced to death. After his direct appeal and state habeas petition proved fruitless, Allen filed a petition for habeas corpus under 28 U.S.C. § 2254 in the district court. During the pendency of his petition, Allen filed two motions asking the district court to give him funds to hire experts to assist him in developing his claims. The district court denied those requests and also denied relief on each of the claims that Allen raised in his petition. Allen has now requested that this court issue a certificate of appealability (COA), and he also appeals the district court's

No. 14-70017

denial of his funding requests. We DENY a COA on Allen's claims and AFFIRM the district court's denial of Allen's funding requests.

## I.

In 2000, the state of Texas charged Allen with capital murder for the death of Kienna Lashay Baker, the two-year-old daughter of Kimberly Renee Jones, the woman with whom Allen had been living. His case proceeded to a jury trial. The prosecution's evidence showed that Allen had lived with Jones and her four children, including the victim, for six months prior to the murder. Allen, then 40 years old, had told Jones, then 23 years old, that he was an evangelist preacher, and he watched Jones's children while she worked. Allen harshly disciplined the children, and the victim feared him. Indeed, all of the children soon became malnourished, sullen, and afraid.

On May 10, 2000, Allen called Jones while she was at work and told her to come home because of an emergency. Allen met Jones in the parking lot of their apartment, saying, "I didn't do anything to her." Allen claimed that the victim had fallen from the toilet after he spanked her for wetting herself. After Jones entered the apartment, she saw the victim lying down in a bedroom wearing only a pair of boy's underwear. Her heart was not beating, and she had foamed at the mouth and nose. Near the victim lay an open jar of Vaseline, suggesting that Allen had sexually assaulted the victim.

Allen repeatedly told Jones not to call 9-1-1, insisting that he needed to "get away," but Jones eventually called for help. When emergency personnel arrived, Allen hid himself and the other children behind a locked bedroom door. Allen fled through a window before police breached the door to the bedroom in which he had been hiding. Officers found two Bibles on the couch, both open to a passage about Jesus raising a girl from the dead.

The victim was later declared dead, and an autopsy concluded that she had died from blunt force trauma to her chest and abdomen. The autopsy also

2

No. 14-70017

suggested that she had been anally raped after being beaten, and that the sexual assault contributed to her death. The medical examiner also noted fifty-six scars on the girl's body, in various degrees of healing, that indicated she had been physically abused many times in the past. Two days after the murder, Allen turned himself in to the police. Allen asserted that the victim's death was accidental, but he also said, "I should never have done it. My temper gets control."

Allen's trial attorneys did not call any witnesses in the guilt/innocence phase of the trial. In closing arguments, the defense disputed that Allen had sexually assaulted the victim and argued that the prosecution had not met its burden to prove that Allen was the killer. The jury disagreed and convicted Allen of capital murder.

The trial then proceeded to the punishment phase, in which the jury would decide whether Allen would receive the death penalty by answering two special-issue questions: (1) whether Allen posed a future danger of violence; and (2) whether sufficient evidence mitigated against a death sentence. *See* Tex. Code Crim. P. Art. 37.071(2)(b)(1), 2(d)(1). From the prosecution's witnesses, the jury learned that years before the murder, Allen had pleaded guilty in Texas to two counts of felony sexual assault, and the probated sentence that he had received for that crime had been revoked because Allen failed to report to officers, did not participate in a court-ordered sex-offender program, and failed to pay fines. A few months after his release from that incarceration, he violated the terms of his parole and then fled to Louisiana. Allen was arrested nine years later, and he then served the remainder of his Texas sentence. After his release, Allen was negligent in updating his sex-offender status, and he also violated the terms of his release by failing to avoid children.

No. 14-70017

Allen's first wife, whom he had secretly dated while she was still a minor and against whom he had committed a misdemeanor assault, testified that Allen was an abusive liar who did not work. She also testified that she suspected Allen had sexually abused the children of a family with whom they had lived. While married to his first wife, Allen had an intimate relationship with a pre-teen girl at the church where he was employed as a youth minister. Allen's second wife testified that he was controlling, jealous, and angry. Allen had been convicted of assaulting her, and she testified that Allen had violently abused her. Another woman testified that Allen had sexually abused her two children. Finally, police officers testified about the neglected and abused condition of Jones's children.

The defense presented testimony showing that Allen claimed to have been the victim of physical and sexual abuse as a child, and as a result, Allen had poor coping mechanisms, low self-esteem, and insufficient life skills to handle stressful situations. The defense also showed that Allen had attempted suicide several times. Individuals who knew Allen testified that he was likeable, bright, trustworthy, and interested in religion. A psychologist testified that Allen would present a low risk of future violence. None of Allen's family were called to testify.

The jury answered the special-issue questions in a manner requiring imposition of a death sentence. Allen's appellate counsel raised fourteen claims on direct appeal, and the Texas Court of Criminal Appeals affirmed. *Allen v. State*, 108 S.W.3d 281 (Tex. Crim. App. 2003). The United States Supreme Court denied certiorari. *Allen v. Texas*, 540 U.S. 1185 (2004).

During the pendency of direct review, Allen filed a state habeas application through appointed counsel, raising 37 grounds for relief. The Court of Criminal Appeals adopted the recommendation of the state habeas court and

denied relief. *Ex Parte Allen*, No. WR-73586-01, 2010 WL 1709947 (Tex. Crim. App. Apr. 28, 2010).

Allen then sought federal habeas review, and the district court appointed counsel for Allen. Allen's amended § 2254 petition raised the following grounds for habeas relief:

> 1: The Texas death penalty scheme violates the Sixth, Eight, [*sic*] and Fourteenth Amendments to the United States Constitution by not requiring the state to prove aggravating factors relevant to the mitigation special issue beyond a reasonable doubt before the jury may sentence the defendant to death. . . .

> 2: The State of Texas, by requiring individual counties to fund the prosecution of capital cases, injects arbitrariness into the selection of which cases will be tried as capital cases; this violates the Eight [*sic*] and Fourteenth Amendments to the United States Constitution. . . .

> 3: The Texas 12-10 Rule, and the law prohibiting jurors from being informed that their individual vote that life is the proper sentence will lead to a life sentence, violates the Eighth and Fourteenth Amendment [*sic*] as construed by Mills v. Maryland and McKoy v. North Carolina. . . .

> 4: The State trial court violated petitioner's Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause against [a prospective juror]. . . .

> 5: Petitioner's trial counsel were ineffective for failing to subpoena witnesses who were key to the mitigation special issue. . . .

The district court denied Allen's two requests for expert witness funding, which Allen sought to develop his ineffective-assistance-of-trial-counsel claim.

After receiving supplemental briefing regarding the impact of *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), the district court denied claims 1–3 on the merits, concluding that Allen had failed to meet the standard set forth in § 2254(d). The district court concluded that Allen had procedurally defaulted his jury-selection claim by failing to assert an objection at trial, and also that,

No. 14-70017

for the same reason, Allen had failed to sufficiently develop the record on that claim. Finally, because Allen did not raise his ineffective-assistance claim in the state courts, and because the district court concluded that Allen could not avoid § 2254(b)(1)'s procedural bar to review of unexhausted claims, the district court concluded that it need not reach the merits of the ineffective-assistance claim, and it denied Allen's re-urged expert-funding request. In the alternative, the district court concluded that Allen's ineffective-assistance claim lacked merit. The district court, therefore, denied relief, and it also denied a COA *sua sponte*. Allen then filed a motion for a COA in this court, asking for a COA as to the district court's resolution of his five grounds for habeas relief and its denials of Allen's motions under 18 U.S.C. § 3599(f) for expert-witness funding.

## II.

Allen's request for a COA is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 100 Stat. 1214. AEDPA requires a habeas petitioner to first obtain a COA before he may obtain review of a district court's denial of habeas relief. 28 U.S.C. § 2253(c)(1)(A). This court may issue a COA only if the applicant has "made a substantial showing of the denial of a constitutional right." § 2253(c)(2). Where the petitioner faces the death penalty, "any doubts as to whether a COA should issue must be resolved" in the petitioner's favor. *Medellin v. Dretke*, 371 F.3d 270, 275 (5th Cir. 2004) (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)). To make a substantial showing, a petitioner must show that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)) (internal quotation marks omitted). When a habeas petition has been denied only on

6

procedural grounds without reaching the merits, a COA should not issue unless the petitioner "shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

If claims have been "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d) applies. Section 2254(d) imposes two significant restrictions on federal review of a habeas claim. First, the federal court's review is limited to "the evidence presented in the state court proceeding." § 2254(d)(2); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (limiting review under § 2254(d)(1) to the record before the state court that adjudicated the claim on the merits). Second, the federal court may not grant habeas relief unless the state court's adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). Pure questions of law and mixed questions of fact and law are analyzed under § 2254(d)(1). *Simmons v. Epps*, 654 F.3d 526, 534 (5th Cir. 2011). Under the "contrary to" clause, a federal court may grant relief if the state court reached an opposite result from the Supreme Court on a set of materially indistinguishable facts or arrives at a conclusion opposite to that reached by the Supreme Court on a question of law. *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). Under the "unreasonable application clause," habeas relief may be granted if the state court correctly identified a legal principle from the Supreme Court's jurisprudence but misapplied that principle to the facts or "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should

No. 14-70017

apply." *Id.* (citing *Williams*, 529 U.S. at 407).  Pure questions of fact are reviewed under § 2254(d)(2).  *Id.*

If a claim has not been exhausted in state court, AEDPA generally bars relief unless the applicant can make one of two showings not relevant here. § 2254(b).  The Supreme Court, however, has identified equitable exceptions to this procedural bar.  In particular, an applicant may overcome the procedural bar and assert unexhausted claims if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  In *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012), the Supreme Court concluded that ineffective assistance by a state habeas attorney may amount to cause where state procedural law requires that an ineffective assistance of trial counsel claim be raised in an initial state habeas application.  The Supreme Court extended *Martinez* in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), to cases in Texas, where state law—on its face—permits an ineffective assistance of trial counsel claim to be raised on direct appeal, but in effect makes it virtually impossible to do so.  To meet *Martinez*'s "cause" exception, the applicant must show that the representation provided by his state habeas counsel fell below the standards established in *Strickland*[1] and that his underlying ineffective assistance of trial counsel claim "is a substantial one, which is to say . . . that the claim has some merit." *Martinez*, 132 S. Ct. at 1318.

Finally, Allen challenges the district court's refusal to grant funding to hire an expert witness to assist him in developing his unexhausted claim for ineffective assistance of trial counsel.  "[A] COA is not necessary to appeal the denial of funds for expert assistance." *Smith v. Dretke*, 422 F.3d 269, 288 (5th

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

No. 14-70017

Cir. 2005). Under 18 U.S.C. § 3599(f), "[u]pon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor . . . ." We have "interpreted 'reasonably necessary' to mean that the petitioner must show that he has 'a substantial need' for the requested assistance," and we "review the denial of funding for investigative or expert assistance for an abuse of discretion." *Brown v. Stephens*, 762 F.3d 454, 459 (5th Cir. 2014) (quoting *Riley v. Dretke,* 362 F.3d 302, 307 (5th Cir. 2004)), *cert. denied*, 135 S. Ct. 1733 (2015).

### III.

### A.

Allen first seeks a COA on his *Apprendi* claim regarding the mitigation special issue during the punishment phase of his trial. In *Apprendi v. New Jersey*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). The Court applied this rule to capital-sentencing schemes in *Ring v. Arizona*, holding that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. 584, 589 (2002). When a state requires a finding of an aggravating circumstance before the death penalty may be imposed, "aggravating factors operate as the functional equivalent of an element of a greater offense," and "the Sixth Amendment requires that they be found by a jury." *Id.* at 609 (internal quotation marks and citation omitted).

No. 14-70017

In Texas, a defendant convicted of murdering an individual under ten years of age is guilty of capital murder, and if the state seeks the death penalty, the defendant "shall be punished by imprisonment . . . for life without parole or by death." Tex. Penal Code §§ 12.31 and 19.03. However, before a defendant convicted of capital murder may be sentenced to death, the jury must answer statutory special issues in a separate proceeding. Tex. Code Crim. P. art. 37.071. In Allen's case, the jury was required to answer two special issues. First, the jury was asked: "Do you find beyond a reasonable doubt that there is a probability that the defendant, Kerry Dimart Allen, would commit criminal acts of violence that would constitute a continuing threat to society?" *See id.* art. 37.071(b)(1), (c). The jury unanimously answered in the affirmative and, therefore, proceeded to the next question. This second question was: "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Kerry Dimart Allen, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentenced be imposed?" *See id.* art. 37.071(e)(1). The jury unanimously answered in the negative, requiring a death sentence.

Allen concedes that we have rejected previous *Apprendi* challenges to Texas's mitigation special issue. However, as Allen observes, "aggravating circumstances can be considered in connection with the mitigation special issue" because they "may be relevant to determine whether a particular mitigating circumstance or set of circumstances is sufficient to warrant a life sentence." *Jackson v. State*, 992 S.W.2d 469, 478 (Tex. Crim. App. 1999). Allen therefore argues that the Texas death penalty scheme runs afoul of *Apprendi* because the jury is not instructed that any aggravating factors considered by

No. 14-70017

the jury when answering the mitigation special issue must be proven by the state beyond a reasonable doubt.

On direct appeal, the Texas Court of Criminal Appeals denied this claim on the merits, concluding that *Apprendi* is inapplicable to Texas's special-issue capital-sentencing scheme because *Apprendi* "applies to facts that increase the penalty beyond the 'prescribed statutory maximum,'" and under the Texas Penal Code, "the 'prescribed statutory maximum' for capital murder is fixed at death." *Allen*, 108 S.W.3d at 285 (quoting *Apprendi*, 530 U.S. at 490); *see also* Tex. Penal Code §§ 12.31 and 19.03. The Court of Criminal Appeals reasoned that "[n]othing the jury or judge decided during the punishment phase could have enhanced appellant's sentence beyond the prescribed range." *Allen*, 108 S.W.3d at 285. The Court of Criminal Appeals relied on this ruling in rejecting this claim in state habeas proceedings. To obtain a COA on this claim, Allen must show that reasonable jurists would find it debatable whether the Court of Criminal Appeals's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

Allen points to *Ring* as clearly establishing his claim. In *Ring*, the Court found that Arizona's death-penalty sentencing scheme, which allowed "the trial judge, sitting alone, [to determine] the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty," ran afoul of *Apprendi*. 536 U.S. at 588–89, 609.

The district court found that Allen's reliance on *Ring* was foreclosed by our precedent, and we agree. We have "specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances." *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007). This is because, through the guilt-innocence phase, "the state was required to

11

No. 14-70017

prove beyond a reasonable doubt every finding prerequisite to exposing [the defendant] to the maximum penalty of death. . . .  [A] finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death." *Granados v. Quarterman*, 455 F.3d 529, 536–37 (5th Cir. 2006); *see also Turner v. Quarterman*, 481 F.3d 292, 299–300 (5th Cir. 2007) ("Texas capital juries make the eligibility decision at the guilt-innocence phase. . . . *Ring* is inapposite to any discussion of the constitutional requirements of the selection phase."); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005) ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.").

Allen attempts to avoid this line of our cases by directing his challenge toward the jury's ability to consider aggravating circumstances in determining the mitigation special issue.  In Allen's view, the jury is properly anchored to a beyond-a-reasonable-doubt standard when finding aggravating circumstances during the guilt-innocence phase, but aggravating-circumstance determinations improperly become a free-for-all when the jury considers them in its resolution of the second special issue.  However, in resolving the mitigation special issue, the jury did not find aggravating circumstances that exposed Allen to the death penalty.  The jury reached the mitigation special issue only because it had already found the existence of such aggravating circumstances, and had already determined that Allen was eligible to receive a death sentence.  Under *Scheanette* and *Granados*, then, the district court correctly held that the jury's consideration of aggravating circumstances in connection with the mitigation special issue is not governed by *Apprendi* and *Ring*.

In sum, our precedent forecloses Allen's *Apprendi* claim.  Therefore, we deny Allen's request for a COA on this claim.

12

No. 14-70017

## B.

Allen next seeks a COA on his claim that a lack of uniformity in prosecutorial discretion across Texas counties due to disparate state funding violates the Eighth and Fourteenth Amendments. Under Texas law, each county pays the attorney's fees and investigative expenses for defendants facing capital-murder charges. *See* Tex. Code Crim. P. art. 26.052. Capital-murder cases are expensive to litigate, and not only for the defense; district attorney's offices also expend considerable resources in the prosecution of capital-murder cases. Allen cites studies estimating that, in total, each capital-murder case costs a county roughly $2.3 million. Allen argues that because of the high cost of prosecuting capital-murder cases, larger and more well-funded counties—such as Harris County, where Allen was convicted— more frequently pursue the death penalty than do smaller, less well-funded counties. Because counties have disparate funding, and because the high cost of capital-murder cases influences prosecutorial discretion, Allen argues that Texas's administration of the death penalty varies arbitrarily and capriciously across county lines in violation of the Eighth and Fourteenth Amendments.

Allen raised this claim on direct appeal and provided supporting evidence. Namely, Allen presented statistics from the Texas Department of Criminal Justice's website showing the number of offenders sentenced to death and executed from each county (with Harris County leading the pack), a press release from a Texas legislator stating that capital-murder prosecutions cost taxpayers an average of $2.3 million per case and that rural counties cannot always seek the death penalty due to financial constraints, and two newspaper articles describing the financial burdens that capital prosecutions impose on smaller counties. *Allen*, 108 S.W.3d at 286. The Court of Criminal Appeals found that this evidence did not suffice to prove disparate prosecution due to disparate county funding because Allen did not provide "budgetary data for

No. 14-70017

each" Texas county. *Id.* The court further noted that even assuming that smaller counties are less financially able to pursue capital cases, "the Capital Litigation section of the Texas Attorney General's office exists especially to aid smaller counties in prosecuting capital cases." *Id.* at 286 n.3.

In any event, the Court of Criminal Appeals rejected Allen's claim because it concluded that "[t]he fact that Harris County, a large county with a large budget, sentences more offenders to death than any other county in Texas, does not in and of itself establish disparate treatment among similarly situated defendants." *Id.* at 286. The court observed that one of the newspaper articles on which Allen relied even acknowledged that "the 'history of ample budgets' is only one of several factors that contribute to the higher number of death penalty convictions in Harris County." *Id.* The Court of Criminal Appeals, therefore, denied Allen's claim on the ground that he had made "no threshold showing of disparate treatment between himself and other similarly situated defendants." *Id.* at 287. The Court of Criminal Appeals clarified in a subsequent case that it had denied Allen's claim on the merits also as legally insufficient (not merely factually deficient) because it concluded that the Constitution does not prohibit financial resources as being one factor among many in the exercise of prosecutorial discretion whether to pursue the death penalty. *Crutsinger v. State*, 206 S.W.3d 607, 612–13 (Tex. Crim. App. 2006).

During Allen's state habeas proceedings, the Court of Criminal Appeals denied the claim on the merits, relying upon its prior resolution of that claim on direct appeal. Because his claim was denied on the merits, Allen must show that reasonable jurists would debate whether the state court's decision was based on an unreasonable determination of the facts or was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d).

14

No. 14-70017

On federal habeas review, the district court analyzed Allen's claim as one raising an equal-protection argument and denied it on the merits. In his motion for a COA, Allen asserts that this was error because, before the district court, he specifically disclaimed reliance on the Equal Protection Clause. Allen appears to argue that the district court should have instead analyzed his claim under a cruel and unusual punishment rubric.

Regardless of how Allen packages this claim, he cannot show that the district court's rejection of his claim was debatable. Even assuming that Allen has provided facts sufficient to support the premise of his argument, no Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions. Indeed, while Allen cites Supreme Court cases generally requiring that capital-punishment regimes not be enforced arbitrarily and capriciously, the state court's application of these precedents was not unreasonable because the Supreme Court has specifically acknowledged that differing law enforcement resources and prosecutorial discretion make uniform application of the death penalty impossible.

In support of his claim, Allen principally relies on *Gregg v. Georgia*, 428 U.S. 153 (1976). In *Gregg*, the Supreme Court upheld a Georgia murderer's death sentence against a cruel and unusual punishment challenge. Georgia's death-penalty scheme required, in a separate proceeding after the guilt-innocence phase, a finding of at least one enumerated aggravating circumstance beyond a reasonable doubt. *Id.* at 163-66. If such an aggravating circumstance were found, then the discretionary decision whether to impose the death penalty rested on a consideration of any relevant aggravating and mitigating circumstances. *Id.* Justice Stewart, writing for a three-justice plurality, began by noting that the death penalty cannot "be imposed under sentencing procedures that create[] a substantial risk that it [will] be inflicted

15

No. 14-70017

in an arbitrary and capricious manner." *Id.* at 188. The plurality reasoned in large part that Georgia law—by requiring, in a separate proceeding, a finding of an enumerated aggravating circumstance, and also allowing consideration of other relevant aggravating and mitigating circumstances—required a consideration of "the specific circumstances of the crime" and "the characteristics of the person who committed the crime," and was sufficient to fairly guide the capital-sentencing decision. *Id.* at 197.

The petitioner in *Gregg*, however, pointed to the many areas of discretion still left open by Georgia's scheme, including the fact that "the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them." *Id.* at 199. But the Court found no constitutional problem with the wide latitude that Georgia gave prosecutors, jurors, and the governor to extend mercy. The Constitution, the plurality concluded, is concerned not with latitude in the decision to withhold the death penalty, but rather with latitude in the decision to impose it. *Id.* at 199; *see also id.* at 222 (White, J., concurring in the judgment) (separate three-justice plurality) ("The Georgia Legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute, and I cannot accept the naked assertion that the effort is bound to fail.").

Allen argues that Texas's disparate, county-based funding of capital cases results in arbitrary and capricious sentencing outcomes and violates the holding of *Gregg*. He also cites the Supreme Court's general pronouncements regarding the Constitution's prohibition of arbitrariness and caprice in capital-sentencing decisions, and the Court's statements that sentencing regimes avoid arbitrariness and caprice by focusing the capital-sentencing decision on the circumstances of the crime and characteristics of the particular

16

No. 14-70017

defendant. *E.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 436 (2008) (noting that, to satisfy the Eighth Amendment, "[o]ne approach [of the Court] has been to insist upon general rules that ensure consistency in determining who receives a death sentence"); *McClesky v. Kemp*, 481 U.S. 279, 308 (1987) (presuming that a death sentence was not arbitrarily imposed "[b]ecause [the] sentence was imposed under Georgia sentencing procedures that focus discretion on the particularized nature of the crime and the particularized characteristics of the individual defendant") (internal quotation marks omitted).

The Court of Criminal Appeals reasonably concluded that Texas's differential funding is consistent with these precedents. Texas's capital-sentencing regime focuses the decision to impose the death penalty on the circumstances of the crime and the characteristics of the defendant. Moreover, the Supreme Court has specifically held that, "absent a showing that [a] capital punishment system operates in an arbitrary and capricious manner, [a defendant] cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty," and "opportunities for discretionary leniency [do not render] the capital sentences imposed arbitrary and capricious." *McCleskey*, 481 U.S. at 306-07. The Court in *McCleskey* further noted that "[n]umerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt"; for example, "[t]he capability of the responsible law enforcement agency can vary widely." *Id.* at 307 n.28. The Court's express acknowledgment of prosecutorial discretion and varying law-enforcement capabilities cuts against Allen's position. Allen has not established that the state court unreasonably applied Supreme Court precedent in rejecting Allen's claim. Therefore, we deny a COA on this claim.

No. 14-70017

## C.

Allen next seeks a COA on his *Mills* claim that the trial court's punishment-phase instructions confused the jury in a manner that increased the likelihood of a death sentence.[2] The trial court instructed the jury that any answer to Texas's special issues that could result in Allen receiving a death sentence must be unanimous, but that ten or more jurors would have to agree to any answer supporting a life sentence. These instructions tracked the language of Tex. Code Crim. P. art. 37.071, popularly known as the "12-10 rule." *See, e.g.*, *Resendiz v. State*, 112 S.W.3d 541, 548 (Tex. Crim. App. 2003). Although Texas law requires that, to *answer* the special issues in a manner requiring a life sentence, ten of twelve jurors must agree on the answer, it also provides that if the jury is *unable to reach an answer* on either special issue (e.g., if only eleven jurors believed that mitigating circumstances were insufficient to warrant a life sentence), the trial court must sentence the defendant to life imprisonment. Tex. Code Crim. P. 37.071(d)(2), (g). Therefore, if a single juror believes that mitigating circumstances warrant a life sentence and all of the others do not, the jury will be unable to answer the mitigation special issue and the trial court will, therefore, have to sentence the defendant to life. A single juror thus has the power to prevent a death sentence based on his personal view of the mitigation evidence.

Allen argues that this sentencing process was confusing and violated *Mills v. Maryland*, 486 U.S. 367 (1988), because it gave the jurors the misimpression that they did not have an individual ability to prevent a death

---

[2] Allen argues that the jury expressed confusion over the 12-10 rule during its deliberations, but the record shows otherwise. Rather, *prior to hearing the jury charge*, a juror expressed that "there is some confusion on our part from the instructions we heard originally on [the 12-10 rule]." The trial court responded that "[i]t will all be in the Court's charge," and the juror replied, "[t]hat's all we need to know." The record reflects no further inquiry after the instructions were read.

No. 14-70017

sentence based upon their personal view of the mitigating evidence. Allen raised this claim in his state habeas proceedings, and the state court denied it on the merits. Therefore, to obtain a COA on this claim, Allen must show that reasonable jurists would debate whether the state court violated, or unreasonably applied, Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

In *Mills*, the Supreme Court "held invalid capital sentencing schemes that require juries to disregard mitigating factors not found unanimously." *Beard v. Banks*, 542 U.S. 406, 408 (2004). Because the Constitution requires that jurors be able to consider *any* mitigating evidence, *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978), *Mills* prohibits sentencing instructions that would lead reasonable jurors to conclude that they are prevented "from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384.

The Supreme Court has declined to give *Mills* a broad construction. *See Smith v. Spisak*, 558 U.S. 139, 148–49 (2010). In *Spisak*, the Court reviewed jury instructions and forms that "made clear that, to recommend a death sentence, the jury had to find, unanimously and beyond a reasonable doubt, that each of the aggravating factors outweighed any mitigating circumstances." *Id.* at 148. The Court found no *Mills* problem because "the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously. Neither the instructions nor the forms said anything about how—or even whether—the jury should make individual determinations that each particular mitigating circumstance existed." *Id.* The Court noted that *Mills* error occurs only where jurors are led to believe that they are "precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence *of a particular such circumstance*." *Id.* (quoting *Mills*, 486 U.S. at 384) (emphasis added).

19

No. 14-70017

Allen points to no instruction in his case that would have led jurors to believe that they were required to agree on the existence of any particular mitigating circumstance. Indeed, the instructions in Allen's case specifically provided that jurors "need not agree on what particular evidence supports an affirmative finding on" the mitigation special issue.

Moreover, as the district court correctly observed, we have repeatedly rejected arguments against the 12-10 rule like the one that Allen raises here, holding that the 12-10 rule does not violate *Mills*. *See, e.g.*, *Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014); *Druery v. Thaler*, 647 F.3d 535, 542–43 (5th Cir. 2011); *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir. 2000); *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir. 1994).

Allen attempts to distinguish our prior cases on the ground that he was sentenced after Texas's 1991 revisions to the mitigation special issue. The district court rejected this argument because several of our cases in fact examined the post-1991 mitigation special issue. *Reed*, 739 F.3d at 761 (petitioner charged in 1997); *Parr v. Thaler*, 481 F. App'x 872 (5th Cir. 2012) (petitioner convicted in 2004); *see also Druery v. State*, 225 S.W.3d 491, 495 (Tex. Crim. App. 2007) (petitioner convicted in 2003). Allen argues that these newer cases relied on precedent that analyzed the pre-1991 mitigation special issue. However, that the later cases relied on older precedent does not allow the panel to disregard their holdings and flout the circuit's rule of orderliness— "only an intervening change in the law . . . permits a subsequent panel to decline to follow a prior Fifth Circuit precedent." *United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013). Allen cites no such change in the law. Therefore, the district court correctly held that Allen's *Mills* argument is foreclosed by binding circuit precedent. *E.g.*, *Druery*, 647 F.3d at 542–43. Moreover, although Allen cites precedent from the Sixth and Seventh

20

No. 14-70017

Circuits,[3] we must follow our own precedent. Therefore, we deny a COA on this claim.

## D.

Allen next seeks a COA on his claim that the state trial court violated his Sixth and Fourteenth Amendment rights by denying his motion to strike a prospective juror for cause. After individual voir dire, Allen challenged the prospective juror for cause on the ground that he could not be impartial, particularly with regard to considering mitigation evidence, but the trial court denied the request. Once individual voir dire concluded, but before exercising any peremptory strikes, Allen sought four additional strikes from the trial court, arguing that four prospective jurors disqualified themselves by their answers and that he should receive four additional peremptory strikes to exercise against those jurors. The court deferred ruling until such time as the defense expended its allotment of peremptory strikes. During the peremptory strike process, when the court and the attorneys reached the last juror

---

[3] *Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003); *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989). We have previously rejected the argument that *Kubat* calls into question our jurisprudence upholding Texas's 12-10 rule under *Mills*. *Druery*, 647 F.3d at 543 (although *Kubat* "arguably supports Petitioner's claims under the Eighth and Fourteenth Amendments," it "does not supercede intervening Fifth Circuit precedent regarding challenges to Texas' 12-10 rule.").

*Davis* and *Kubat* are also distinguishable. In *Davis*, the trial judge, immediately after his instruction regarding mitigating circumstances, told the jury, "Now, as you know, since this is a criminal case, the law requires that in order for you to reach a decision all 12 of you must be in agreement." 318 F.3d at 684. In conjunction with other instructions emphasizing the need for unanimity and in the absence of any instruction explaining that an individual juror could prevent the death penalty, the Sixth Circuit found that the jury instruction violated *Mills* because it did not clearly explain the law. *See id.* at 689 ("Given the requirement of unanimity as to the jury's ultimate recommendation of either death or life under Ohio law, it is not surprising that the unarticulated but constitutionally required non-unanimous mechanism that will prevent a recommendation of death is obscured to such an extent that it cannot even be said to be implied by the instructions in this case."). In *Kubat*, the jury instructions misstated the law by requiring unanimous agreement on a decision not to impose the death penalty. 867 F.2d at 370 (noting that the error was undisputed). Here, in contrast, the jury instructions correctly stated the law, and Allen's challenge is to the constitutionality of Texas's 12-10 rule itself.

No. 14-70017

accepted, the defense replied that it accepted her "but we don't have any more strikes." Allen did not object when the trial court read the names of the selected jurors or when the jury was sworn and seated.

Allen used a peremptory strike to remove the prospective juror whom he had sought to remove for cause. Allen argues that, had he not been forced to use this arrow in his quiver, he would have been able to remove the final accepted juror, who he believes was biased against him. During voir dire, that juror testified that on a scale of 1 to 10, with 10 representing someone who would impose the death penalty in every circumstance, she considered herself to fall "between about a five and a seven." Troublingly, the juror also stated in an answer to the jury questionnaire that she believed one group of people is more dangerous than others, and during voir dire, she specified "Blacks." She clarified that "[i]t seems like to me that the group of people that seem to commit the most violent crimes from my point of view and what I hear are blacks." Trial counsel did not ask any more clarifying questions and never challenged the last-accepted juror for cause, remarking only that the defense accepted her "but we don't have any more strikes." Allen claims that she was biased in favor of the death penalty and also biased against Allen because of his race.

Allen raised this asserted error on direct review, but the Court of Criminal Appeals concluded that by failing to identify the last-accepted juror as an objectionable juror before the trial court, Allen had failed to preserve the issue. *Allen*, 108 S.W.3d at 282–83. Allen again raised his juror-selection claim during state habeas proceedings, but the Court of Criminal Appeals— adopting the trial court's recommendation—concluded that Allen had failed to preserve the claim for review, denying it as barred and, in the alternative, meritless. *Ex parte Allen*, 2010 WL 1709947, at *1.

The district court concluded, regarding the prospective juror whom Allen removed, that "[n]o constitutional violation results from a defendant having to

No. 14-70017

use a peremptory strike to remove objectionable jurors." This is undoubtedly a correct statement of the law, and to the extent that Allen makes arguments about that prospective juror's impartiality in his motion for a COA, these arguments do not present a cognizable constitutional claim because the prospective juror did not sit on the jury. *See Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) ("We have long recognized that peremptory challenges are not of constitutional dimension. . . . So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."). The district court further concluded that by failing to contemporaneously object to the last-accepted juror, Allen procedurally defaulted the claim, thereby barring federal habeas review. Regardless of the procedural bar, the district court concluded that Allen's failure to develop an adequate record precluded a determination that the last-selected juror was biased.

"It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury." *Ross*, 487 U.S. at 85. Both an unwillingness to consider mitigating evidence and racial bias constitute a lack of impartiality. *See id.* at 85 (jurors are biased when their views on capital punishment prevent them from following the law); *Turner v. Murray*, 476 U.S. 28, 35 (1986) (discussing impermissible juror bias against blacks). A death sentence must be overturned where a partial juror sat on the jury that sentenced the defendant to death and the defendant "properly preserved his right to challenge the trial court's failure to remove [the partial juror] for cause." *Ross*, 487 U.S. at 86. Correspondingly, under the procedural default doctrine, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez*, 132 S. Ct. at 1316. "A state court's invocation of a procedural rule to deny a prisoner's claims

precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Id.*

The district court's ruling that Allen procedurally defaulted this claim is not debatable. Under Texas law, "[e]rror is preserved only if the defendant exhausts his peremptory challenges, is denied a request for an additional peremptory challenge, identified a member of the jury as objectionable and claims that he would have struck the juror with a peremptory challenge." *Nelson v. State*, 848 S.W.2d 126, 134 (Tex. Crim. App. 1992) (en banc). As set forth above and as the state courts found, Allen failed to identify the last-accepted juror as objectionable before the trial court. This state-law ground was adequate to support denial of Allen's claim, and Allen has not shown that the Texas courts fail to consistently follow the contemporaneous objection rule or that the rule is not firmly established. *Martinez*, 132 S. Ct. at 1316. Indeed, we have "consistently upheld [Texas's contemporaneous objection rule] as an independent and adequate state ground that procedurally bars federal habeas review of a petitioner's claims." *Rowell v. Dretke*, 398 F.3d 370, 374 (5th Cir. 2005).

Allen argues that Texas's contemporaneous objection rule is inadequate to preclude federal review because it serves no palpable state interest. Allen relies on *Lee v. Kemna*, 534 U.S. 362 (2002), for this contention, but *Lee* provides him no support. In *Lee*, the petitioner had sought a continuance of his state murder trial on the ground that critical alibi witnesses left the courthouse during trial, and the trial court denied the continuance request. *Id.* at 369–70. Lee's conviction was affirmed, and post-conviction relief was denied, because his continuance request had failed to comply with a state procedural rule requiring that such continuance requests be made by written motion and contain certain factual showings. *Id.* at 372–73. The Court held

No. 14-70017

that this state procedural rule was inadequate to prevent federal habeas review in Lee's particular case because the state trial court had denied the continuance request for a reason unrelated to the state procedural rule, no state appellate decisions had ever required strict compliance with the procedural rule in the circumstances of Lee's case, and Lee had substantially complied with the state procedural rule by stating on the record the reason for the continuance request. *Id.* at 381–83, 387. Here, however, Allen cannot show an absence of Texas decisions requiring compliance with the contemporaneous objection rule, or that he substantially complied with the rule. Although he explained to the trial court the basis for his belief that the prospective juror whom he later removed was biased, he lodged no objection toward the last-accepted juror.

Moreover, in its *Lee* opinion, the Supreme Court relied on *Osborne v. Ohio*, 495 U.S. 103 (1990), in which the Court had held that Ohio's contemporaneous objection rule was adequate to bar federal habeas review on an issue that counsel did not raise before trial, reasoning that the contemporaneous objection rule "serves the State's important interest in ensuring that counsel do their part in preventing trial courts from" committing error. *Lee*, 534 U.S. at 377 (quoting *Osborne*, 495 U.S. at 123). Texas's contemporaneous objection rule serves that same important state interest—giving trial courts the chance to correct their own errors—and Allen has not shown that he contemporaneously objected or otherwise put the trial court on notice of the last-accepted juror's alleged bias against him.

Allen also argues that the Court of Criminal Appeals's decision was not based upon an adequate and independent state-law ground because the state habeas court, in addition to concluding that the claim was not preserved, denied the claim on the merits in the alternative. However, we have held that "the fact that the state court alternatively addressed the merits of [a] claim

No. 14-70017

does not prevent its procedural default determination from being an independent basis that bars review by the federal courts." *Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003). Therefore, the procedural-default doctrine applies to Allen's jury-selection claim, and Allen can overcome the procedural bar only by showing "cause for the default and resulting prejudice or that a fundamental miscarriage of justice would result." *Id.*; *see also Martinez*, 132 S. Ct. at 1316. Allen has not done so. Thus, we deny a COA on this claim.

**E.**

Allen seeks a COA on his claim that his trial counsel provided ineffective assistance by failing to subpoena certain of Allen's family members to testify during the punishment phase of his trial. According to the affidavit of Gerald Bierbaum, who worked as a mitigation specialist and investigator on Allen's trial, Allen's defense team interviewed certain "family members, neighbors and paramours," some of whose testimony "supported the physical and sexual abuse Mr. Allen suffered" before leaving home as a teenager. However, some of the witnesses—apparently Allen's family members—whom the defense team had expected to cooperate refused to come to trial once they learned the nature of the testimony that would be elicited, and by that time it was too late to procure out-of-state subpoenas for them. The thrust of Allen's ineffective-assistance claim is that his trial counsel should have subpoenaed these witnesses in advance to ensure that they would testify and support the mitigating evidence that Allen was repeatedly physically and sexually abused as a child. Instead, because the family members declined to testify, Allen's trial counsel elicited only second-hand testimony from individuals—most prominently the defense expert—who recounted Allen's self-reported claims of victimization.

Allen concedes that he did not raise this claim in the state courts; therefore, § 2254(b)(1) bars relief for this unexhausted claim. However, Allen

No. 14-70017

argues that he can overcome this procedural bar under *Martinez* and *Trevino* because his state habeas counsel was ineffective, and this ineffectiveness was the reason for the procedural default of his ineffective-assistance claim.  The district court concluded that Allen could not overcome the procedural bar, and in the alternative, that his ineffective-assistance claim was meritless because he had not established that additional testimony from Allen's family members would have changed the outcome.

Allen's argument fails because even assuming that Allen's state habeas counsel was ineffective, which argument we need not reach, Allen cannot establish that his underlying ineffective-assistance-of-trial-counsel claim "is a substantial one, which is to say . . . that the claim has some merit." *Martinez*, 132 S. Ct. at 1318.  "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687).  To establish deficient performance, Allen must demonstrate that counsel's "acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The *Strickland* Court cautioned that:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must

No. 14-70017

overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689 (internal citations and quotation marks omitted). "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (citation and internal quotation marks omitted).

Allen has not shown that his trial counsel's failure to subpoena Allen's family members was constitutionally deficient. Allen's principal evidence—Bierbaum's affidavit—establishes that Allen's trial counsel hired multiple investigators who interviewed "family members, neighbors and paramours"; that the defense team discussed the mitigating evidence and decided to retain Dr. Bettina Wright to provide expert testimony; that as trial approached, the team selected witnesses to testify; that the defense team assumed the witnesses would cooperate based on their interviews; that shortly before trial some of the out-of-state witnesses refused to come to trial after learning the nature of the testimony that the defense intended to elicit; and that when the witnesses refused to appear, it was too late to subpoena them.[4] Although in retrospect it may have been prudent to subpoena these witnesses in anticipation of a possible change in their attitudes, it was not "outside the wide range of professionally competent assistance" to assume that Allen's family members, who had been cooperative and had provided mitigating testimony in

---

[4] Allen's trial counsel still put on evidence of Allen's abuse at sentencing through Wright's expert testimony. Allen's counsel also elicited testimony from Allen's ex-wife on cross-examination that Allen had told her that he had been molested by his uncle, but the court sustained the government's hearsay objection and instructed the jury to disregard the statement. Allen makes a plausible argument that further corroborating testimony could have been dispositive, pointing out that multiple jury notes during the sentencing phase deliberation indicate that the jury was not only interested in, but also divided on, the reliability of Wright's testimony and the possible statements of Allen's family members upon which Wright had relied. However, this argument goes to *Strickland*'s prejudice prong, which we do not reach.

No. 14-70017

their interviews, would be willing to testify on his behalf at a trial that could result in a death sentence.  *See Harrington*, 562 U.S. at 110 ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."); *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("This Court has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative.").  Accordingly, we deny Allen's request for a COA on this claim.

## F.

Finally, Allen appeals the district court's denial of his requests for funds to hire experts to help develop his ineffective-assistance claim.  Allen requested the funds to assist him in investigating which family members trial counsel contacted and what mitigation-related information those family members communicated to trial counsel.[5]  Allen and his federal habeas counsel did not have this information because they were unable to obtain all of Allen's trial counsel's files, and the files that they did obtain contained no information regarding any mitigation investigation.   The district court denied Allen's funding request based on its conclusion that Allen had not shown that he could use the funding to develop a viable claim.

The district court did not abuse its discretion in denying Allen's request for funding.  A district court may deny a habeas petitioner's request for funds

---

[5] These facts would be required to prove Allen's ineffective-assistance claim.  *See Day*, 566 F.3d at 538 ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

29

No. 14-70017

under § 3599 when the petitioner has "failed to supplement his funding request with a viable constitutional claim that is not procedurally barred" or "when the sought-after assistance would only support a meritless claim." *Brown*, 762 F.3d at 459 (citation omitted).  As discussed above, Allen has not established a viable claim that his trial counsel's performance was constitutionally deficient. Nor are we persuaded by Allen's argument that granting him funding to investigate his claim would produce the necessary evidence to support a viable claim.  Allen seeks to investigate the testimony his family members would have given if they had been subpoenaed.  This testimony might possibly lend support to Allen's prejudice argument, but it has no bearing on the reasonableness of trial counsel's expectation leading up to trial that the family members would continue to cooperate and would appear to testify without being subpoenaed, and therefore cannot cure Allen's failure to establish the performance prong of his *Strickland* claim.[6]

Finally, we have rejected the argument that *Martinez* and *Trevino* require the granting of funds to develop claims such as Allen's.  *See Crutsinger v. Stephens*, 576 F. App'x 422, 431 (5th Cir. 2014) ("*Martinez* . . . does not mandate pre-petition funding, nor does it alter our rule that a prisoner cannot show a substantial need for funds when his claim is procedurally barred from review.") (holding that district court did not abuse its discretion by denying funding where petitioner failed to show that underlying ineffective-assistance claim was substantial), *cert. denied*, 135 S. Ct. 1401 (2015).  Accordingly, the

---

[6] Of course, Allen's argument also assumes that the family members will cooperate with the investigator.  Allen's federal habeas counsel represented at oral argument that he had tried calling Allen's out-of-state family members but was unable to reach anyone other than Allen's twin sister, who stated that other family members did not want to be contacted. Thus, even if the district court granted Allen funding, it is far from certain that the family members would be any more willing to cooperate now than they were at the time of Allen's sentencing trial.

No. 14-70017

district court did not abuse its discretion when it denied Allen's requests for funding under § 3599.

## IV.

In light of the foregoing discussion, we DENY a COA on all of Allen's claims and AFFIRM the district court's denial of Allen's funding requests.